UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

YVONNE WARNSLEY,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          No. 1:09-CV-00300-JD
                                    )
POSTMASTER GENERAL and              )
UNITED STATES POSTAL SERVICE,       )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendants' Motion for Summary Judgment [DE 20], filed on

December 10, 2010.  Plaintiff responded on January 21, 2011 [DE 24], and Defendants replied

on January 27, 2011 [DE 26].  For the following reasons, Defendants' Motion for Summary

Judgment is GRANTED.

## I. BACKGROUND

Plaintiff, Yvonne Warnsley, an African American female, began her employment with

the United States Postal Service ("USPS") on March 14, 1987.  DE 21-1 at 1.  Her permanent

position was a Network Specialist at the Fort Wayne Processing and Distribution Center

("FWP&DC").  *Id.*  At all times relevant to the present case, Warnsley was the acting Supervisor

of Distribution of Mail Processing.  DE 21-1 at 2.  Janet Bultemeier, a white female, was the

Plant Manager of the FWP&DC and managed the Mail Processing Unit, Transportation Unit,

Maintenance Unit, and In-Plant Support.  *Id.*  In her position as Supervisor of Distribution of

Mail Processing, Warnsley was under Bultemeier's management control.  *Id.*

On April 8, 2008, a Vacancy Announcement for Manager [of] Distribution Operations

("MDO") was posted and Warnsley applied for the position.  *Id.*  The MDO reported directly to

Bultemeier and oversaw the sorting and processing of incoming mail. *Id.* There were two other applicants for the MDO position: Martin Hunnicutt (a white male) and Debbie Anderson (an African American female). *Id.*

Bultemeier assembled an advisory interview panel consisting of herself and the other managers that reported to her: Terry Walker (an African American male), Manager of Distribution Operations; Terry Freeman (an African American male), Manager of Maintenance; and Linda White (a white female), Manager of In-Plant Support. *Id.* at 2-3. The interviews took place on June 23, 2008. *Id.* at 3. Each member of the panel composed a list of questions relevant to the knowledge needed for the position. DE 21-1 at 3; DE 21-2 at 1, 23, 26. Each candidate was asked the same questions by the panel member, and each answer was rated with a score one through five. DE 21-1 at 3; DE 21-2 at 1, 23, 26. After the interview of each candidate, the panel members calculated their scores, and discussed the candidates' answers. DE 21-1 at 3; DE 21-2 at 1, 23, 26. An overall score was then computed for each candidate. DE 21-1 at 3; DE 21-2 at 1, 23, 26.

After considering answers to the interview questions, Hunnicutt and Warnsley were tied in their scores. DE 21-1 at 3; DE 21-2 at 1, 23, 27. As a result of this tie, the panel discussed other criteria that they felt were relevant to the position: dependability, including attendance; how each candidate interacted with other managers; who was a better "team player"; and trustworthiness. DE 21-1 at 3; DE 21-2 at 1, 24, 27.

On July 8, 2008, Bultemeier forwarded her recommendation that Hunnicutt be selected for the position to Senior Plant Manager, Bernice Grant (an African American female). DE 21-1 at 3. Bultemeier selected Hunnicutt over Warnsley because some of the panel members had

voiced concerns about Warnsley's trust and dependability and felt that Hunnicutt would be a better team player. *Id.* In fact, Warnsley admitted that there were trust issues between herself and Terry Freeman and Linda White. DE 25-1 at 1. Also in her affidavit, Bultemeier stated that she thought Hunnicutt's experience in automations and key sorting functions would assist him in the mail sorting aspect of the MDO position. DE 21-1 at 3. Further, in the eight to nine months Bultemeier had been supervising both Hunnicutt and Warnsley, Hunnicutt had taken no unscheduled leave, while Warnsley had. *Id.* While attendance was not the determining factor, Bultemeier stated that good attendance was an important criterion for a manager, who must set a good example for the employees he or she supervises. *Id.*

On June 17, 2008, a vacancy announcement for Manager [of] Transportation/Networks ("MTN") was posted and Warnsley applied for the position. *Id.* Four other employees also applied for the position: Laurence Fowler (a white male); Alice Wim-Lee (an African American female); Reynolds Rodriguez (a Filipino male); and Lisa Curltin (a white female). DE 21-1 at 4.

Prior to any interviews for the MTN position, on July 11, 2008, Warnsley was involved in an altercation on the workroom floor with Erlinda Garza (a Hispanic female), Supervisor of Maintenance Operations. *Id.* at 4, 12. Several employees witnessed the altercation. *Id.* at 13-15. According to the witnesses, Warnsley and Garza first engaged in a verbal disagreement about Garza moving a large mail cage on the workroom floor. *Id.* Garza told Warnsley that she was told to move the cage by Bultemeier and that Warnsley should contact Bultemeier if she was concerned. *Id.* at 12, 15. According to at least one of the witnesses, the disagreement escalated and Warnsley and Garza began pushing the cage back and forth. *Id.* at 15. Garza eventually

stopped pushing and turned her back to the cage. *Id.* Warnsley then pushed the cage into Garza's back. DE 21-1 at 15.

Shortly after the incident happened, Garza told Bultemeier about the incident and stated that she was going to obtain statements from the witnesses. *Id.* at 4. When Bultemeier talked with Warnsley regarding the incident, she denied hitting Garza. *Id.* Bultemeier received the witnesses' statements on July 15, 2008. *Id.* Garza notified the Postal Inspection service of the incident and asked for an investigation, and also filed a police report. *Id.* at 4, 22. Bultemeier chose not to act on the allegations until she had personally spoken to the witnesses to determine if Warnsley's actions were intentional. *Id.* at 4. Further, because an inspection service investigation was requested, Bultemeier was told by the Labor Department to defer interviewing any witnesses until after the inspection investigation was completed. *Id.*

On July 21, 2008, Bultemeier and an interview advisory panel conducted interviews for the MTN position. *Id.* Freeman and White joined the panel again. *Id.* In his affidavit, Walker stated that he chose not to participate because he disagreed with Bultemeier's decision to promote Hunnicutt over Warnsley because he did not fully trust Hunnicutt; however, Walker admitted that Warnsley was also absent on several occasions from work and that the panel members did not feel that she was as dependable as Hunnicutt. DE 21-2 at 2. As with the MDO position, each of the interviewers composed a list of questions to ask each candidate concerning the knowledge needed for the position. DE 21-1 at 4; DE 21-2 at 24, 27. Warnsley, Fowler, Wim-Lee, and Rodriguez were all interviewed. DE 21-1 at 4; DE 21-2 at 24, 27. Each candidate's answer was given a score of one through five. DE 21-1 at 4; DE 21-2 at 24, 27. After each interview, the panel members calculated their scores, discussed the candidate

answers, and arrived at an overall score.   DE 21-1 at 4; DE 21-2 at 24, 27.   Because one candidate was on annual leave, she was not interviewed until either July 24 or July 25.   DE 21-1 at 4.   Warnsley was awarded the highest overall score of all the candidates.   *Id*.; DE 21-2 at 24, 27.   Again, it was Bultemeier's responsibility to make the final selection for the position.   DE 21-2 at 24, 27.

Bultemeier received a copy of the Investigative Report from Postal Inspection Services on July 25, 2008.   DE 21-1 at 5.   After reading the Report, she decided to interview Warnsley and the witnesses herself to try to determine whether Warnsley's actions during the altercation were intentional.   *Id*.   However, from reading the report, Bultemeier determined that regardless of whether Warnsley intentionally struck Garza, Warnsley's behavior during the July 11, 2008 incident—engaging in a loud argument and a physical struggle with another employee—was inappropriate and not the type of behavior she expected from a manager.   *Id*.   As a result, on August 1, 2008, Bultemeier decided to select Rodriguez, the candidate who received the second highest overall interview score, for the MTN position.   *Id.*   Grant approved the selection, and on August 4, 2008, Rodriguez was notified of his selection.   *Id*.   Freeman and White, the other two members of the interview panel, stated that they did not disagree with this decision.   DE 21-2 at 24, 28.

On July 31, 2008, Bultemeier, along with Gene Mills, a Postal Service Labor Specialist, interviewed Warnsley concerning the July 11, 2008 incident.   DE 21-1 at 5, 48-50.   During the interview, Warnsley acknowledged that she was familiar with the USPS's "Zero Tolerance Policy."   *Id*. at 48.   Warnsley also agreed that she had previously told Bultemeier that she did not hit Garza.   *Id*. at 49.

On August 5, 2008, Bultemeier, along with Mills, interviewed Robert Clark, Eric Rogers, and Mark Imel concerning what they witnessed on July 11, 2008. *Id*. at 5, 51-53. Rogers and Clark both confirmed that they saw Warnsley push the cage into Garza. *Id*. at 51, 52. Rogers stated that he thought Warnsley intentionally struck Garza with the cage, while Clark stated that he thought the impact was accidental. *Id*. at 51, 52. Clark and Rogers both indicated that the incident "escalated" and was "heated." *Id*. at 51, 52.

Based on her interviews with Warnsley, Rogers, Clark, and Imel, along with the Investigative Report by the Postal Inspector, Bultemeier determined that Warnsley's actions on July 11, 2008 were intentional and violated the USPS's Zero Tolerance Policy.[1] DE 21-1 at 6. Further, Bultemeier determined that Warnsley violated USPS Standard of Conduct § 665.16, Behavior and Personal Habits,[2] by proffering false statements concerning the July 11, 2008 incident, when she denied hitting Garza. *Id*. Pursuant to USPS policy, Bultemeier issued to Warnsley a letter of Notice of Proposed Removal on August 18, 2008. *Id*. at 6, 54. Warnsley's

---

[1] The USPS's "Zero Tolerance Policy" can be found in the Employee and Labor Relations Manual ("ELM"), § 665.24, Violent and/or Threatening Behavior, which states:

> The Postal Service is committed to the principle that all employees have a basic right to a safe and humane working environment. In order to ensure this right, it is the unequivocal policy of the Postal Service that there must be no tolerance of violence or threats of violence by anyone at any level of the Postal Service. Similarly, there must be no tolerance of harassment, intimidation, threats, or bullying by anyone at any level. Violation of this policy may result in disciplinary action, including removal from the Postal Service.

DE 21-1 at 56.

[2] The text of ELM § 665.16, Behavior and Personal Habits, is as follows:

> Employees are expected to conduct themselves during and outside of working hours in a manner that reflects favorably upon the Postal Service. Although it is not the policy of the Postal Service to interfere with the private lives of employees, it does require that postal employees be honest, reliable, trustworthy, courteous, and of good character and reputation…Employees are expected to maintain harmonious working relationships and not to do anything that would contribute to an unpleasant working environment.

DE 21-2 at 37.

representative, Ken Lauter, was allowed to file a response to the Notice of Proposed Removal. DE 21-3 at 1.

On August 21, 2008, Warnsley made initial contact with an EEO Counselor and subsequently filed an informal charge of discrimination against the USPS alleging race and sex discrimination with reference to her non-selection for the two manager positions for which she applied. DE 21-3 at 1. On October 22, 2008, Plaintiff made an initial contact with an EEO Counselor and subsequently filed an informal charge of discrimination against the USPS alleging race and sex discrimination with reference to her receipt of the Notice of Proposed Removal. *Id.* at 14-18.

On October 24, 2008, Lauter sent a written response to Jeff Mitchell, Manager of In-Plant-Support, and on October 30, 2008, Lauter participated in a response meeting with Mitchell. *Id.* at 5, 9. At the response meeting, Lauter claimed that Warnsley's acts were not violent and that the Notice of Proposed Removal was in response to Warnsley filing an EEO charge of discrimination, notwithstanding the fact that the notice was issued three days before Warnsley ever contacted the EEO. *Id*. at 5. Based on the information in the Inspection Service's Investigative Report and the witnesses' statements, Mitchell determined that Warnsley's actions did exhibit violence. *Id.* Additionally, Mitchell determined that the Notice of Proposed Removal was not in response to the EEO activity, because it was issued prior to Warnsley's initial contact with an EEO Counselor. *Id.* On November 7, 2008, Mitchell issued his Letter of Decision for Notice of Proposed Removal to Warnsley explaining that she would be discharged from the USPS, effective November 15, 2008. DE 21-3 at 6-13. In the Letter of Decision, Mitchell explained that "the evidence of record supports the charge of [Warnsley's] engaging in

violent and/or threatening behavior . . . [and] the charge of proffering false statements." *Id.* at 10. In addition, Mitchell explained that throughout the investigative process, Warnsley falsely denied her misconduct when witness statements established that she interfered with Garza's complying with Bultemeier's instructions, angrily confronted Garza, and then pushed the cart into her. *Id.* at 12.

Warnsley filed her formal EEO Complaint of Discrimination dated November 7, 2008, citing allegations of race and sex discrimination with regard to her non-selection for the two management positions. *Id.* at 19. Since Warnsley had previously contacted an EEO Counselor about her Notice of Removal, the EEO incorporated the sex and race discrimination issue into its removal case. DE 1 at 5. The final EEO decision finding no discrimination was sent to Warnsley on July 24, 2009. *Id.* at 18. On October 1, 2009, Warnsley filed this action. DE 1. Her complaint alleges discrimination on the basis of race and sex in violation of Title VII of the Civil Rights Act.

## II.  SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dembsey v. Atchison*, *Topeka, & Santa Fe Ry. Co.* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette,* No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Once the moving party has met this burden, the nonmoving party may not merely rely on allegations or denials in its own pleading; rather its response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cnty. REMC,* 840 F.2d 405, 410 (7th Cir. 1988). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue necessitating trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewco Secs. Corp.,* 860 F.2d 1407, 1411 (7th Cir. 1988).

If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper—even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex,* 477 U.S. at 322-23 (holding that a failure to prove one essential element "necessarily renders all other facts immaterial")). In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.,* 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

# III. DISCUSSION

Unlawful discrimination may be proved through direct evidence of impermissible motive, or indirectly through the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973). *See also Bellaver v. Quanex Corp.*, 200 F.3d 485, 492-493 (7th Cir. 2000) (applying this method to gender discrimination cases).

To proceed under the direct method, Warnsley must offer either direct evidence that would prove the fact in question—the discriminatory intent—without reliance on inference or presumption, or "a convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. *Silverman v. Board of Educ. of City of Chicago,* 637 F.3d 729, 734 (7th Cir. 2011) (citations and internal citations omitted). A plaintiff using the "convincing mosaic" approach to prove a discrimination claim under the direct method may present any of three broad types of circumstantial evidence, that is: (1) evidence of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence showing that the employer systematically treated other, similarly situated employees not in the protected group, better; or (3) evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual. *Id.*

In her memorandum, Warnsley states that she has presented direct evidence to support a case of discrimination. DE 25 at 5. But she does not identify the evidence upon which she relies. *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary

judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.").

For the sake of argument, the Court explains why Warnsley's affidavit, DE 25-1, does not create a genuine issue of fact, should it represent her effort to present evidence under the direct method of proof. First, Warnsley's affidavit provides no direct evidence that would prove that USPS's employment decisions were based on her race or sex. Second, Warnsley fails to cobble together sufficient bits and pieces of evidence to produce a convincing mosaic of circumstantial evidence that would allow an inference of intentional discrimination on the part of USPS.

Warnsley points to no evidence that the timing of events was suspicious, and she points to no isolated comments made, or conduct by, USPS relative to race or sex. Warnsley's assertion that Terry Freeman acted differently to those who did not "give his family members special treatment" or those who are "not his followers," are accusations unrelated to race or sex.

Considering the promotions given to Martin Hunnicutt and Reynolds Rodriguez, this evidence is insufficient to establish that USPS systematically treated males or non African Americans better, when in fact, many supervisor or management positions were held by women or African Americans. Moreover, considering Warnsley's termination, while she identifies employees who did not receive "discipline" or who were otherwise not terminated (i.e. Terry Freeman, Mrs. Freeman (Terry's wife), Martin Hunnicutt, Blake Baumgartner, Craig Wright, and Fabien Michel): either, the employee's race or sex are unknown, or in fact, they are female or African American; or, as to each and every one of the employees identified, the facts relative to the employee's being similarly situated are unknown or show that they are not similarly

situated (especially since Warnsley does not identify any employee who was found to have violated both USPS's Zero Tolerance Policy (ELM § 665.24) and Behavior and Personal Habits Policy (§ 665.16)). *See infra*.

Although Warnsley contends that USPS's justifications for its employment decisions were pretextual, her unsupported contentions alone do not constitute sufficient proof upon which a fact-finder could infer intentional discrimination under the direct method of proof, and for that matter, do not create a triable issue of fact, as detailed below relative to each decision rendered by USPS. *See infra*.

Because Warnsley cannot proceed under the direct method, she must proceed under the indirect burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which is set forth by the Court relative to each employment decision made by USPS. Notably, "[b]ecause unlawful discrimination can occur in a variety of employment contexts, '[the Seventh Circuit has] adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace.'" *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002) (quoting *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) (age discrimination case)). *See also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (noting that the *McDonnell Douglas* framework applies to both claims of age and sex discrimination). As a result, the showing necessary to establish differential treatment depends on the facts of the case.

## A. Non-Selection for MDO Position

*1. Prima Facie Case*

To establish her *prima facie* case for race and gender discrimination regarding her non-selection for the MDO position, Warnsley must show that: (1) she is a member of a protected group; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employee promoted was not a member of the protected group and was similarly or less qualified than the plaintiff. *Hobbs v. City of Chicago,* 573 F.3d 454, 460 (7th Cir. 2009) (alleging failure to be promoted as a result of race and gender discrimination). The presumption of discrimination created by establishing a *prima facie* case shifts the burden to the defendant to produce a legitimate, noninvidious reason for its actions. *Id.* If the defendant rebuts the *prima facie* case, the burden then shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id.*

The evidence before the Court establishes the first three elements of Warnsley's claim conclusively. The evidence shows: (1) that Warnsley is an African American female, and is therefore within two protected classes for purposes of Title VII; (2) that she was qualified for the MDO position, and (3) that she was rejected for the position.

Warnsley's *prima facie* case fails, however, at the fourth element: that the employee promoted was not a member of the protected group and was similarly or less qualified than Warnsley. While Hunnicutt, a white male, is outside Warnsley's protected groups, Warnsley has not shown that Hunnicutt was similarly or less qualified for the MDO position. At the end of the interviews for the MDO position, Hunnicutt's and Warnsley's overall scores were tied. Since there was a tie, it is undisputed that the interview panel began to discuss tie-breaking criteria, or other criteria they found relevant to a management position. It is also undisputed that the criteria the panel discussed was how each candidate interacted with other managers, trustworthiness,

13

who was a better team player, and dependability, including attendance. After reviewing these criteria, the panel determined that Hunnicutt was more qualified for the MDO position, and he was offered the promotion.

Warnsley offers no evidence to show that she was similarly or more qualified than Hunnicutt based on these additional criteria examined by the interview panel. In fact, Warnsley concedes that she "fails to demonstrate the final element." DE 25 at 6-7. Aside from this admission, Warnsley also admits that the interviewing panel concluded that Hunnicutt was a better team player, had more experience in operations, and had a better attendance record which indicated he was more dependable. *Id*. at 7.

However, Warnsley does contend that she was unfairly evaluated in the past by the panel members, and therefore the panel had a "bias" that was based upon her race or sex. *Id*. Yet, Warnsley does not provide her past evaluations, she does not identify which aspects of her work were allegedly unfairly evaluated in the past (or explain how the past evaluations were flawed); and more importantly, she assumes, without any evidence to support her suppositions, that the allegedly flawed evaluations (completed on unknown dates and concerning unknown aspects of her work) were somehow related to her race or sex, which was also somehow related to the panel's promotional decision. Other than her subjective self-serving appraisals without factual support in the record, Warnsley does not provide any evidence that she was similarly or more qualified for the MDO position on the additional criteria considered for the promotion. Her unsupported statements are simply not enough to create a genuine issue of fact. *See Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) (citations omitted); *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004). In fact, Warnsley herself admitted that she had

14

trust issues with the panel members, and, Terry Walker admitted that Warnsley missed work often and was not viewed as dependable. Here, Warnsley is unable to call into doubt Hunnicutt's superior qualifications relative to the criteria which the panel admittedly relied on in making the promotional decision for the MDO position, and therefore, this Court must conclude that Warnsley has failed to make out a *prima facie* case of discrimination.

*2. Legitimate, Nondiscriminatory Reason*

Assuming for the sake of argument that Warnsley could establish the *prima facie* case, the Court considers USPS's reasons for its promotional decision. As mentioned, after satisfying the *prima facie* case, the burden would then shift to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action in order to rebut the presumption of discrimination. *Hobbs*, 573 F.3d at 460. Bultemeier explained her reasoning behind selecting Hunnicutt over Warnsley:

> I selected Martin Hunnicutt over Yvonne Warnsley because some direct reports had trust issues with Yvonne Warnsley, and it was felt that Martin Hunnicutt was a better team player. Also, I felt that Martin Hunnicutt had more experience in Operations because he had more experience in automations, a key sorting function. Yvonne Warnsley had more experience in transportation of mail, while the MDO function involved sorting the mail. Also, because I had supervised both Martin Hunnicutt and Yvonne Warnsley for the past 8-9 months, I was aware that Hunnicutt had better attendance than Yvonne Warnsley. Yvonne Warnsley often took unscheduled leave, while Martin Hunnicutt had no unscheduled leave. Because it was important that the MDO set a good example for attendance, I felt this was an important criteria for a manager. However, it was not the primary reason for selecting Hunnicutt over Warnsley.

DE 21-1 at 3. Affidavits provided by the other members of the interview panel support the conclusion that the consideration of these tie-breaking criteria were the reason for Hunnicutt's selection, and that there was no sex or race discrimination involved in the interview process. DE

21-2 at 2, 24, 27.  This explanation of the promotion decision demonstrates a sufficiently legitimate and nondiscriminatory reason for promoting Hunnicutt instead of Warnsley.

*3.  Pretext*

Because the USPS has articulated a nondiscriminatory reason for selecting Hunnicutt over Warnsley, the burden of proof would shift back to Warnsley to show pretext.  Pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action."  *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 838-39 (7th Cir. 2009) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).  If the employer reasonably believed the explanation it offered, the reason is not pretextual. *Silverman v. Bd. of Educ.*, 637 F.3d 729, 744 (7th Cir. 2011); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).  The Court does not "sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination . . . [but on] the issue of pretext, [the Court's] only concern is the honesty of the employer's explanation." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (internal citations and citations omitted).

Pretext may be proved directly by showing evidence that the employer was more likely motivated by a discriminatory purpose, or indirectly by evidence that the proffered reason is not credible or that the reason is factually baseless.  *Senske v. Sybase, Inc.,* 588 F.3d 501, 507 (7th Cir. 2009); *Perez v. Illinois*, 488 F.3d 773, 777-78 (7th Cir. 2007).  Moreover, a plaintiff's qualifications will only serve as evidence of pretext if the differences between the qualifications of the plaintiff and the promoted employee are "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better

qualified for the position at issue." *Hobbs*, 573 F.3d at 462 (citations omitted). In addition, "a plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009).

Warnsley provides very little evidence, aside from her own sworn affidavit, in support of her discrimination claim. Within her own affidavit, Warnsley merely points out that her "experience also included FSM, Manual Operations, and Mail Handlers and [her] tour numbers were higher" than Hunnicutt's. DE 25-1 at ¶7. However, Warnsley's own affidavit does not create a genuine issue of material fact, because she "must do more than challenge the judgment of [her] superiors through [her] own self-interested assertions." *Mills v. First Fed. Sav. & Loan Ass'n. Of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) (citations omitted).

Even considering the statements made in her affidavit, Warnsley does not specify how she performed any better than (or equal to) Hunnicutt on the additional criteria that USPS undisputably considered in rendering the promotional decision. In other words, Warnsley does not identify how her level of trust, dependability, attendance, and ability to be a team player, compared to Hunnicutt's, nor does she show that her qualifications are so favorable that there can be no dispute among reasonable persons of impartial judgment that she was better qualified (or even equally qualified) for the position. Since merely *arguing* superior qualifications is not enough to prove that USPS is lying about the real reason it picked Hunnicutt for the spot, *see Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007), then failing to even discuss how she compared to Hunnicutt relative to the additional criteria considered for the promotion is also insufficient.

Because Warnsley is unable to establish that USPS's proffered reason for promoting Hunnicutt and not Warnsley was not the real reason, has no grounding in fact, or is insufficient to warrant the promotional decision, summary judgment is appropriate. *Senske,* 588 F.3d at 507. In addition, because Warnsley has not shown that Bultemeier's real reason for selecting (or Grant's real reason for approving) Hunnicutt for the promotion in any way concerned race or gender discrimination, Warnsley's claim cannot succeed. *Hobbs*, 573 F.3d at 462.

Because the evidence before the Court would not allow a reasonable jury to conclude, that Warnsley had established a *prima facie* case for discrimination regarding her non-selection for the MDO position, or that the USPS's reason for the promotional decision was pretext, Warnsley's Title VII race and gender discrimination claim must fail.

## B. Non-Selection for MTN Position

### 1. Prima Facie Case

Warnsley next contends that she was subject to race and gender discrimination when she was not selected for the MTN position. Once again, Warnsley must show that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she was rejected for the position; and (4) the employee promoted was not a member of the protected group and was similarly or less qualified than the plaintiff. *Hobbs*, 573 F.3d at 460. As previously discussed, the record evidence indicates that: (1) Warnsley is an African American female, and therefore a member of two protected groups; (2) she was qualified for the MTN position;[3] and (3) she was not selected for the position.

---

[3] While the Court questions whether Warnsley was, in fact, qualified for the MTN position given her conduct surrounding the July 11, 2008 altercation with Garza, the USPS does not dispute that she was qualified. DE 21 at 15-16. The Court accepts this concession and will proceed on the assumption that Warnsley was qualified for the position.

However, as Defendants argue in their memorandum in support of summary judgment, Warnsley has failed to establish the fourth element of her *prima facie* case–that Rodriguez, the employee selected, is outside Warnsley's protected group and was similarly or less qualified for the position than Warnsley. After the interviews for the position were complete, Warnsley had the highest score, and Rodriguez the second highest, with regard to the knowledge and experience required for the position. But only 10 days before the MTN position interviews, Warnsley was involved in an altercation with Garza on the mail room floor. Having received witness statements, Bultemeier knew that several witnesses alleged to have seen Warnsley push a mail cage into Garza in the course of that argument. Regardless of whether Warnsley intended to strike Garza with the cage, Bultemeier concluded after reading the investigative report, that Warnsley had shown behavior which was inappropriate for a manager. Although Warnsley continues to offer a different version of the incident that took place between herself and Garza, Warnsley does not deny that instead of reporting the disagreement, she engaged in an altercation with Garza which escalated into their pushing the cage back and forth. Not only is it undisputed that the altercation took place, but there is no evidence to suggest that Rodriguez displayed any behavior unfitting for a manager. Thus, the Court concludes that Warnsley cannot show that she was similarly or more qualified than Rodriguez in this respect. However, because Warnsley initially scored the highest on the interviews conducted for the MTN position, the Court examines USPS's reason for its promotional decision and conducts the pretext analysis.

## 2. Legitimate Reason and Pretext

Even if Warnsley had established a *prima facie* case, the burden would shift to her employer to rebut the presumption of discrimination by articulating a legitimate,

nondiscriminatory reason for the adverse action.  Here, the USPS cites Warnsley's behavior

during the incident that took place on July 11, 2008, as documented by independent

investigators, as the reason Warnsley was not selected.  Bultemeier explains that:

> I felt that regardless of whether Yvonne Warnsley's actions were intentional her behavior and the manner in which she handled the July 11, 2008 incident was inappropriate and did not set the type of example I expected from a manager.  In particular, I felt Warnsley violated the chain of command by not first contacting me about Garza's instructions from me. Instead, she chose to instigate an argument which she allowed to escalate without knowing all the facts. This is they type of behavior I would not expect from one of my managers.

DE 21-1 at 5.   Affidavits from the other interviewers, White and Freeman, indicate that they

agreed with Bultemeier's decision not to select Warnsley on these grounds.  DE 21-2 at 24, 27.

Since the USPS provided this nondiscriminatory reason for not selecting Warnsley for

the MTN position, the burden would shift back to Warnsley to show that it is merely pretext for

discrimination. *Hobbs*, 573 F.3d at 460.  Again, Warnsley has not met this burden.  In fact,

Warnsley even concedes in her Memorandum that "her conduct concerning the July 11, 2008,

altercation with Erlinda Garza demonstrated she was deficient in a critical skill needed to be a

good manager."  DE 25 at 8.  Aside from this admission, Warnsley provides no evidence

indicating that USPS's offered reason was dishonest or merely a pretext for discrimination.

Although most of her affidavit focuses on whether or not she actually did hit Garza, this is not an

issue before the Court and has nothing to with whether the altercation actually occurred.  Again,

Warnsley does not deny that the altercation with Garza and herself took place and that such

behavior is unfitting of a manager—which was the reason given for USPS's decision.  Thus,

there is no indication that USPS's proffered reason for promoting Rodriguez over Warnsley was

not the real reason, has no grounding in fact, or is insufficient to warrant the decision.

Not only has Warnsley failed to show that USPS lied, Warnsley has also failed to point to circumstances from which a jury could infer that the real reason for lying was discriminatory. *See McGowan*, 581 F.3d at 581 ("a plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law"); *Hobbs*, 573 F.3d at 461-62 ("[o]ur recent Title VII cases explain that a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent."). This she cannot, and does not, show. Nothing in the record, but Warnsley's insufficient baseless speculation (as previously detailed), supports any inference that USPS's promotional decision was based on sex or race.

Because Warnsley has failed to make out a *prima facie* case of discrimination, and because the evidence before the Court would not allow a reasonable jury to conclude that the USPS's proffered justification for Warnsley's non-selection was pretextual, Warnsley's Title VII race and gender discrimination claim regarding her non-selection for the MTN position must fail.

## C. Termination of Employment

In race and gender discrimination cases involving the plaintiff's removal, the plaintiff must establish a *prima facie* case of discrimination by proving that: (1) she is a member of a protected class; (2) her performance met her employer's legitimate performance expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably.[4]

---

[4]Although the *prima facie* case is a flexible analysis that is altered to apply to differing factual situations, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973), and it has been held that a terminated employee can meet the fourth prong of the *prima facie* case by showing that after being terminated, the employee was replaced by

*Barricks*, 481 F.3d at 559; *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860

(7th Cir. 2007); *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006)

(concerning race discrimination claims in violation of Title VII and the Fourteenth Amendment)

(applying *McDonnell Douglas*, 411 U.S. at 802-03).  If the plaintiff can successfully establish a

*prima facie* case of discrimination in regards to her removal, the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Hossack*,

492 F.3d at 860.  If the defendant articulates such a reason, the burden shifts back to the plaintiff,

who must show that the defendant's reason was merely pretext for discrimination.  *Id.*

*1. Prima Facie Case*

As an African American female whose employment with the USPS was terminated,

Warnsley meets elements one and three, but she has failed to provide the Court with evidence

that she performed her work well enough to meet the USPS's legitimate work expectations or

that the USPS treated similarly situated employees who were not African American or were not

females more favorably.

Following the Postal Inspector's investigation into the incident that occurred on July 11,

2008, Bultemeier concluded that Warnsley did not meet the USPS's legitimate work

expectations set forth in the ELM.  DE 21-1 at 6.  The USPS's Zero Tolerance Policy states

"there must be no tolerance of violence . . . by anyone at any level of the Postal Service."  *See*

*supra* note 1.  Further, the ELM's section on Behavior and Personal Habits states that the Postal

Service "require[s] that postal employees be honest, reliable, trustworthy, courteous, . . .

maintain harmonious working relationships and not to do anything that would contribute to an

someone outside of the protected class, *Moser v. Tyson Foods, Inc.*, No. 3:07-cv-359, 2010 WL 1382118 (N.D. Ind. Mar. 29, 2010), the record contains no facts relative to events that transpired subsequent to Warnsley's termination, and therefore Warnsley's claim cannot succeed on a replacement theory.

unpleasant working environment." *See supra* note 2. Bultemeier determined that Warnsley engaged in violent behavior in violation of the Zero Tolerance Policy when she "engaged in a heated argument" with Garza and then hit Garza with the mail cage. DE 21-1 at 54. Warnsley also violated USPS policy when she denied hitting Garza with the mail cage, which the Inspector determined to be untrue based on eyewitness accounts. DE 21-1 at 55. Bultemeier determined that Warnsley's conduct violated the ELM's requirement that employees be honest and trustworthy. *Id.* These findings were agreed with upon Mitchell's review. DE 21-3 at 6-13.

Warnsley must show that she was meeting the USPS's expectations at the time of her termination, which includes evidence that she did not violate the USPS's policies. *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 627 F.3d 596, 600 (7th Cir. 2010). Yet, Warnsley concedes that she violated the Zero Tolerance Policy in her response to the Motion for Summary Judgment, in which she states, "the evidence in this case . . . clearly shows that Plaintiff did violate the Postal Services 'Zero Tolerance Policy.'" DE 25 at 11. Even without her admission to violating the policy, Warnsley only poses a different version of her altercation with Garza, and she admitted that she had "no idea" why the witness statements contradicted her account of the incident and that the only reason the cart touched Garza was because Garza placed her hands on it. *Id*. In short, Warnsley's failure to offer any evidence supported by the record that she did not violate company policies, which were the documented basis for her termination, results in her inability to establish that she was meeting the USPS's expectations at the time of her termination.

As to element four of the *prima facie* case, that the USPS treated similarly situated

employees outside of the protected class more favorably, Warnsley cites little evidence aside

from her own affidavit.  In her affidavit, she alleges:

> Pursuant to Article 665.24, Violent or Threatening Behavior, Terry Freeman
> (black male) was reported to Threat Assessment member by Debra Sauers.  He
> received no discipline.  Further, Blake Baumgartner, a white male, hit another
> employee and was taken off the clock, but still paid for his time off and given his
> job back when it settled at step 1. Craig Wright a black male pushed another
> employee and was put off the clock, but was back at work the next day.  The same
> occurred to Fabien Michel in Gary, Indiana.

DE 25-1 ¶ 23-24.  Warnsley also alleges, without elaboration, that Hunnicutt had previously

been involved in creating a hostile work environment and received no discipline, and that "[o]n

one occasion, Mrs. Freeman, an employee of the service did not receive discipline."  *Id.* at ¶¶ 5,

14.

On summary judgment, the plaintiff bears the burden of showing that she is similarly

situated to the employee whose treatment she compares to her own. *Patterson v. Avery Dennison

Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  Recently, the Seventh Circuit stated:

> The similarly situated analysis requires a context-based examination of all
> relevant factors. *South v. Ill. Environ. Protection Agency,* 495 F.3d 747, 752–53
> (7th Cir. 2007) (citing *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404 (7th
> Cir. 2007) (holding that the plaintiff failed to show that comparators with the
> same employment responsibilities and the same supervisor were similarly
> situated, as the plaintiff failed to show they had similar employment history or
> had otherwise engaged in similar conduct)). It "ought not be construed so rigidly
> or inflexibly that it [becomes] a useless analytical tool." *Id.* at 752. Nevertheless,
> "the comparators must be similar enough that any differences in their treatment
> cannot be attributed to other variables." *Silverman v. Bd. of Educ. of Chi.,* 637
> F.3d 729, 742 (7th Cir. 2011). This generally requires the plaintiff to show that
> the comparator had the same supervisor, was subject to the same employment
> standards, and had engaged in conduct similar to that of the plaintiff. *See South,*
> 495 F.3d at 752.  Because the similarly situated analysis does not require
> numerosity, the plaintiff need offer evidence as to only one similarly situated
> comparator. *Humphries,* 474 F.3d at 406–07. Overall, "the inquiry simply asks

whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* at 405.

*Eaton v. Indiana Dept. Of Corrections,* 2011 WL 3966145, *4 (7th Cir. Sept. 9. 2011). In addition, it is "routinely stated that similarly situated employees must be 'directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations.'" *Id*. at *7. Further refining the inquiry, the Seventh Circuit has explained that "all material respects" means comparable experience, education and qualifications, "provided that the employer took these factors into account when making the personnel decision in question." *Id.* (citing *Patterson*, 281 F.3d at 680) (other citations omitted).

With respect to the individuals identified above, Warnsley fails to carry her burden to establish that she was similarly situated to these individuals. Warnsley does not specify any of the circumstances surrounding the alleged conduct that the employees engaged in, and she does not identify the ultimate decision-maker who made the decision concerning the appropriate discipline to be given. The Court is also unaware of when the events (of which Warnsley complains) occurred and is unaware of the individuals' duties at the time.

With regards to Baumgartner, Wright, and Fabien Michel, who Warnsley claims were involved in violent altercations with coworkers but not fired, Warnsley cited nothing to show that they were situated similarly to her with respect to *any* aspect of their employment, let alone any material aspect. For example, she fails to state or cite evidence to show that they shared her job duties, supervisor, or any other set of circumstances. As such, the record does not establish that they were similarly situated.

Relative to Hunnicutt and Terry Freemen, Warnsley does not describe when or how Hunnicutt caused a hostile work environment, she does not describe when or how Terry (a manager, not a supervisor) engaged in threatening behavior, and she does not indicate how her conduct was similar to their conduct, thus deserving of the same or similar punishment.

Lastly, Warnsley does not identify any employee who was found to have violated both USPS's Zero Tolerance Policy (ELM § 665.24) and Behavior and Personal Habits Policy (§ 665.16). In making its termination decision, USPS documented that Warnsley was terminated for engaging in an altercation which constituted a violation of the Zero Tolerance Policy, and for making false statements concerning the incident which constituted a violation of the Behavior and Personal Habits Policy. Simply put, there is no evidence in the record that any employee who was found to have violated both of these policies remained on the job. Thus, no identified employee is similarly situated. *See Eaton,* 2011 WL 3966145, *7.

Therefore, because Warnsley does not identify any similarly situated employee who engaged in comparable conduct, including her policy violations, she cannot establish that any individual was situated similarly to her and was treated more favorably. Accordingly, she has failed to satisfy the fourth element of her *prima facie* case.

*2. Legitimate Reason and Pretext*

Even if the Court were to find that Warnsley met her burden of proof and established a *prima facie* case of discrimination in her removal, her claim cannot survive the next part of the analysis. The USPS has articulated a legitimate, nondiscriminatory reason for Warnsley's termination, that is, her violation of company polices, as discussed above. The burden then

would shift back to Warnsley, who would have to establish that the reason was a pretext for discrimination.

Again, the only question asked is whether USPS had a legitimate, nondiscriminatory reason for firing Warnsley, not whether it made the correct decision. *Naik,* 627 F.3d at 601 (citing *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.")). "If it is the true ground and not a pretext, the case is over." *Naik,* 627 F.3d at 601 (citing *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417 (7th Cir. 2006)).

Here, USPS put forth a legitimate, nondiscriminatory reason for terminating Warnsley. USPS believed, whether wrong or right, that Warnsley violated the Zero Tolerance Policy and Warnsley does not deny that the altercation took place. USPS also believed, whether wrong or right, that Warnsley then offered false statements about what occurred. And, although Warnsley continues to offer a different version of the incident, she never alleges in her affidavit that her actions surrounding the incident of July 11, 2008 were not the reasons that the USPS terminated her employment. Rather, she argues that she did not act violently toward Garza. As explained above in Part III.A.3, the Court's inquiry is not whether the USPS made the proper decision; it is whether the reasons the USPS articulated for its decision were honest. The evidence in the record establishes that Bultemeier determined that Warnsley had violated the USPS's Zero Tolerance Policy and subsequently lied about her actions. Bultemeier based her decision on the Postal Inspector's investigation report and several eye witness accounts. Senior Plant Manager Jeff Mitchell conducted a review of the entire matter and agreed that the evidence supported the

charge of Warnsley's engaging in violent and/or threatening behavior, and the charge of
Warnsley's proffering false statements by falsely denying her misconduct when witness
statements established that she interfered with Garza's complying with Bultemeier's instructions,
angrily confronted Garza, and then pushed the cart into her. Thus, Mitchell confirmed that
Warnsley's conduct violated both of USPS's policies. Although Warnsley continues to argue
that she was "innocent of the charge," DE 25 at 14, her self-serving assertions are without record
support (and, are in fact contradicted by the record evidence). But more importantly, there is no
evidence to show that USPS's reasons for terminating her are incredible or without factual basis;
and, there is certainly no evidence to suggest that the decision was rendered on the basis of
discrimination. Therefore, she does not meet her burden of showing that the proffered reasons
for her termination were a pretext.

Because the evidence before the Court would not allow a reasonable jury to conclude that
Warnsley's termination from the USPS was a result of race or gender discrimination, Warnsley's
Title VII race and gender discrimination claim must fail.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is hereby
GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Defendants and
against Plaintiff on all claims, and to treat this case as closed.

SO ORDERED.

ENTERED:   September 26, 2011

                    /s/ JON E. DEGUILIO
                    Judge
                    United States District Court